UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JIMMY C. MOORE,<br><br>                    Plaintiff,<br><br>     v.<br><br>CITY OF BOISE; BOISE CITY POLICE DEPARTMENT; DAN MUGUIRA; TAD MILLER; and JESSICA BOVARD,<br><br>                    Defendants. | Case No. 1:16-cv-00346-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

Plaintiff, a prisoner in the custody of the Idaho Department of Correction, is proceeding pro se and in forma pauperis in this civil rights action. Now pending before the Court in this civil rights matter is a Motion for Summary Judgment filed by Defendants Muguira, Miller, and Bovard, the only remaining Defendants. (Dkt. 40.)

Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record and that oral argument is unnecessary. *See* D. Idaho Loc. Civ. R. 7.1. Accordingly, the Court enters the following Order granting Defendants' Motion and dismissing this case with prejudice.

## INTRODUCTION

In August 2016, Plaintiff filed this action pursuant to 42 U.S.C. § 1983, alleging excessive force and medical treatment claims against the City of Boise and the Boise

Police Department, as well as two police officers and a community service officer, stemming from Plaintiff's arrest for domestic violence.[1] On initial review of Plaintiff's Complaint pursuant to 28 U.S.C. §§ 1915 and 1915A, the Court dismissed Plaintiff's medical treatment claims, as well as his excessive force claims against the City of Boise and the Boise Police Department, but allowed Plaintiff to proceed on his excessive force claims against Officer Dan Muguira, Officer Tad Miller, and Community Service Officer Jessica Bovard. (Initial Review Order, Dkt. 9.)

These remaining Defendants filed a timely Motion for Summary Judgment, which is now ripe for adjudication.[2] (Dkt. 40.)

## PLAINTIFF'S OBJECTION TO JANUARY 5, 2018 ORDER

On January 5, 2018, this Court ordered Plaintiff to submit to Defendants the documents identified as Exhibits 2 through 20 and 22 to Plaintiff's opposition to Defendants' Motion for Summary Judgment. (Dkt. 68.) Plaintiff has now done so, but he has also objected to the Order. (*See* Dkt. 70.) The Court construes the objection as a request for reconsideration of the Court's Order requiring Plaintiff to submit the documents to Defendants and allowing Defendants to review those documents. So construed, the request will be denied.

---

[1]     Plaintiff was convicted of felony domestic violence and misdemeanor resisting arrest following the arrest at the center of this lawsuit. (Ex. H to Muir Decl., Dkt. 40-6, at 3-7.)

[2]     The Court previously denied Plaintiff's cross-motion for summary judgment as untimely. (*See* Dkt. 68 at 3-5.)

A federal court has the "inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (internal quotation marks and emphasis omitted). Although courts have the authority to reconsider prior orders, they "should be loath to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 n. 8 (1983)).

"[C]ourts have distilled various grounds for reconsideration of prior rulings into three major grounds for justifying reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence or an expanded factual record; and (3) need to correct a clear error or to prevent manifest injustice." *Gray v. Carlin*, No. 3:11-CV-00275-EJL, 2015 WL 75263, at *2 (D. Idaho Jan. 6, 2015) (internal quotation marks omitted). However, a motion for reconsideration of an interlocutory order should not be used "as a vehicle to identify facts or raise legal arguments which could have been, but were not, raised or adduced during the pendency of the motion of which reconsideration was sought." *Jones v. Casey's Gen. Stores*, 551 F. Supp. 2d 848, 854-55 (S.D. Iowa 2008) (internal quotation marks omitted).

The Court does not find sufficient cause to reconsider its January 5, 2018 Order. Plaintiff was required to provide his evidence to Defendants, and that is what the Order instructed him to do. Given that Plaintiff had not provided a copy of the exhibits to

Defendants, Defendants naturally were allowed to review them and, if they deemed it warranted, to object to them. Therefore, the Court will deny Plaintiff's request for reconsideration.

However, the Court has reviewed the portions of the transcripts from Plaintiff's criminal trial, which he has submitted as exhibits. (*See* Dkt. 70 at 7.) (Court staff had previously been unable to locate these documents but has since found them.) Plaintiff offers the transcripts to call into question some of Defendants' allegations in their Statement of Material Facts. Where Plaintiff's assertions or the transcripts differ from Defendants' factual allegations in this action so as to constitute a genuine dispute of material fact, the Court will accept Plaintiff's version of events for purposes of this decision.

### DEFENDANTS' OBJECTIONS TO PLAINTIFF'S EXHIBITS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants object (Dkt. 71) to some of Plaintiff's exhibits on various grounds. *See* Fed. R. Civ. P. 56(c). First, Defendants correctly note that a document entitled "Glen Dowdle – Upstairs Neighbor – Interview" is not an affidavit or declaration, it is not sworn, and it is not signed. (*See* Dkt. 70, document identified as "Exhibit A.") It does not indicate the author of the document, nor does it contain any statement that it is based on personal knowledge. Thus, this document is inadmissible pursuant to Rule 56(c)(4) and will not be considered by the Court.

Defendants next object to the Affidavit of Ryan Tone, of which the Court has two handwritten copies in different handwriting; one of the affidavits appears to be in

Plaintiff's handwriting and the Court presumes the other to be in Tone's handwriting. (*See* Dkts. 47 & 70.) Because Defendants were provided only with the copy presumably written by Tone (Ex. to Dkt. 70), that is the copy to which the Court refers throughout this decision.

Defendants are correct that the statements Mr. Tone says he overheard, to the extent those statements are offered for the truth of the matter asserted and were spoken by individuals other than Defendants, are inadmissible hearsay. *See* Fed. R. Evid. 801(c), (d)(2). Further, the events described by Tone occurring before Defendants arrived at Plaintiff's apartment are irrelevant. However, the Tone Affidavit does contain some relevant information, and Mr. Tone's personal observations are admissible. Thus, the Court will consider the admissible portions of the Tone affidavit in resolving Defendants' Motion.

Finally, Defendants object to medical records of the victim of the crime for which Plaintiff was arrested and convicted. These records are irrelevant to whether Defendants used excessive force in arresting Plaintiff and, therefore, are inadmissible. *See* Fed. R. Evid. 402.[3]

---

[3] Further, to the extent Plaintiff offers these records in an attempt to show that someone other than himself injured the victim and committed the crime for which Plaintiff was arrested, such evidence is afforded no weight, because Plaintiff has been convicted of domestic battery against the victim for this incident. Thus, collateral estoppel applies to bar Plaintiff from relitigating the issue of whether he battered the victim. *See Rodriguez v. Dep't of Correction*, 29 P.3d 401, 404 (2001). Collateral estoppel will be discussed further below.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants seek summary judgment on Plaintiff's excessive force claims. For the reasons that follow, Defendants' Motion will be granted.

### 1.    Factual Background

####       i.        Preclusive Effect of Plaintiff's Criminal Convictions

Before the Court sets forth the facts of this case, it must consider whether and to what extent Plaintiff's criminal convictions constrain the evidence the Court can review in resolving Defendants' Motion for Partial Summary Dismissal.

Collateral estoppel, also known as issue preclusion, refers to the preclusive effect of previous litigation. The doctrine of collateral estoppel prohibits a party from relitigating an issue that the party has previously litigated unsuccessfully in another action.

"State law governs the application of collateral estoppel or issue preclusion to a state court judgment in a federal civil rights action." *Ayers v. City of Richmond*, 895 F.2d 1267, 1270 (9th Cir. 1990). Thus, to determine the preclusive effect of Plaintiff's criminal convictions, the Court looks to Idaho law.

In Idaho, "five factors must be evident in order for collateral estoppel to bar the relitigation of an issue determined in a prior proceeding":

> (1) the party against whom the earlier decision was asserted had a full and fair opportunity to litigate the issue decided in the earlier case; (2) the issue decided in the prior litigation was identical to the issue presented in the present action; (3) the issue sought to be precluded was actually decided in the prior litigation; (4) there was a final judgment on the merits in the prior litigation; and (5) the party against whom

the issue is asserted was a party or in privity with a party to
the litigation.

*See Rodriguez v. Dep't of Correction*, 29 P.3d 401, 404 (2001).

Because Plaintiff was convicted of domestic battery and resisting arrest, two issues relevant to the instant civil rights action were litigated during Plaintiff's state criminal case: (1) whether Plaintiff committed a serious felony crime (domestic battery); and (2) whether Plaintiff resisted arrest. *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007) (stating that factors in an excessive force inquiry include the seriousness of the offense for which the plaintiff was arrested and whether the plaintiff resisted arrest). Both were serious charges—the domestic battery charge especially—giving Plaintiff the motivation to fully litigate the charges, and Plaintiff's convictions have not been invalidated or otherwise called into question. *See Ayers*, 895 F.2d at 1271 (stating that, under California law, collateral estoppel requires that "the prior conviction must have been for a serious offense so that the defendant was motivated to fully litigate the charges ... [and] there must have been a full and fair trial to prevent convictions of doubtful validity from being used"). Therefore, the first element of collateral estoppel is satisfied with respect to both issues: Plaintiff had a full and fair opportunity to litigate whether he battered Patsey and whether he resisted arrest. *See Rodriguez*, 29 P.3d at 404.

The second and third elements of collateral estoppel are also met in this case. The issues of Plaintiff's battery of Patsey and his actions in resisting arrest both factor into the Court's Fourth Amendment analysis, and the jury actually had to decide both of these questions. With respect to the resisting charge specifically, the jury's guilty verdict

establishes that Plaintiff "wilfully resist[ed], delay[ed], or obstruct[ed]" the officers "in the discharge ... of [the officers'] duty." Idaho Code § 18-705. Finally, the fourth and fifth elements of collateral estoppel have been satisfied because Plaintiff's conviction is the result of a final state court judgment and because Plaintiff was the same person convicted in that judgment. *See Rodriguez*, 29 P.3d at 404.

Therefore, to the extent any evidence submitted by any party tends to suggest either that (1) Plaintiff did not commit domestic battery against Patsey or (2) Plaintiff did not resist arrest, such evidence will be disregarded. The fact that Plaintiff battered Patsey and resisted arrest for that offense will, therefore, be treated as undisputed.

ii.     Additional Undisputed Facts

This section includes facts that are undisputed and material to the resolution of the issues in this case. Where material facts are genuinely in dispute, the Court has included Plaintiff's version of facts, insofar as that version is not contradicted by clear documentary evidence in the record, such as the officers' audio recordings of the arrest. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")

This section also includes facts that are deemed undisputed pursuant to Federal Rule of Civil Procedure 56(e)(2), which states, "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion."

In response to Defendants' Statement of Material Facts (Dkt. 40-1), Plaintiff specifically disputes only a few of those facts, which the Court will note in the following factual recitation. (*See* Dkt. 47 at 3-20.) With respect to the majority of Defendants' Statement of Material Facts, however, Plaintiff states in general that he "disagrees" with a particular fact, that the information is "highly inflammatory" and an "attack on Plaintiff's character," and that the fact is not relevant. (Dkt. 47 at 4-13.) Additionally, Plaintiff states frequently, and overly generally, that an assertion made by Defendants is "an issue of material fact." (*Id*.)

These objections are not sufficient to properly address the facts as set forth by Defendants or otherwise to constitute genuine disputes of material fact. Therefore, as to any of the facts set forth by Defendants to which Plaintiff objects on only these generalized bases and does not submit his own factual allegations to the contrary (*see, e.g.,* Pl. Decl., Dkt. 47-1), the Court will consider such facts undisputed. *See* Fed. R. Civ. P. 56(e)(2).

On November 29, 2014, Officers Dan Muguira and Tad Miller of the Boise Police Department were dispatched to Plaintiff's and his wife's apartment after "Ada County Dispatch advised that they had an open line from the 911 caller's phone and could hear a man yelling in the background." (Def. Stmt. of Material Facts ("SOMF"), Dkt. 40-1, at ¶ 1.) The officers knocked on the door and announced themselves[4]; Plaintiff's wife,

---

[4]        Though Defendants state that they knocked several times, the Court accepts, for purposes of this decision, Plaintiff's allegation that the officers knocked only once.

Patsey Powell, opened the door. (Dkt. 47 at 4.) Though Patsey first told the officers to "go away"—which can be heard in the officers' audio recordings of the incident (*see* Ex. E to Miller Decl., Dkt. 40-4, at 0:09; Ex. B to Muguira Decl., Dkt. 40-5, at 0:11)—she also "gestured for Officer Miller to enter the residence." (SOMF at ¶ 1.) The officers noticed that Patsey had "a heavily bruised left eye" that was "severely swollen." (Miller Decl. at ¶ 2; Muguira Decl. at ¶ 3.) Patsey then stepped outside to speak with Officer Muguira, while Miller entered the apartment to speak with Plaintiff.

During Muguira's outside interview with Patsey, he saw that Patsey "had blood coming out of her nose and dried blood on her mouth." (SOMF ¶ 4.) She told Muguira "that her injuries were the result of being punched in the face" by Plaintiff. (*Id.*) Patsey stated that Plaintiff had been drinking. (Ex. B to Muguira Decl. at 1:24-1:26.) Patsey reported that she did not remember everything about the assault because she had blacked out partway through it.

Muguira observed to Patsey that, from the pattern of her bruises, it appeared Plaintiff "obviously ... punched you in the eye, and he punched you in the mouth, and it looks he punched you in the nose, so there's at least three that I'm counting. Any more?"[5] Patsey responded with an unintelligible sound; Muguira then said, "Okay." (*Id.* at 1:58-2:09.) Ryan Tone contends in his affidavit that when Muguira noted it looked like Plaintiff had hit Patsey three times, Patsey corrected Muguira and said "that it was only

---

[5]       For some inconceivable reason, Defendants did not have the audio recordings of the arrest transcribed, or, if they did, they did not attach the transcriptions to their affidavits in support of their Motion. The Court has done its best to accurately transcribe the cited portions of those recordings in this decision.

once." (Tone Aff. at ¶ 5.) The Court does not accept Tone's contention for purposes of summary judgment because it is blatantly contradicted by the audio recording; whatever Patsey said, it was certainly not anything to the effect that she had been hit only once. *See Scott*, 550 U.S. at 380. As noted previously, Patsey passed out during the incident and thus could not remember the entire beating—which would include how many times she was punched.

While Muguira spoke to Patsey outside, Officer Miller entered the apartment to speak with Plaintiff, who was sitting in a recliner. Miller observed that Plaintiff's eyes were glassy and bloodshot, that Plaintiff was slurring his speech, and that a strong odor of alcohol was present. (SOMF at ¶ 3.) Plaintiff told Miller several times to leave the apartment, which Miller refused to do. Miller began questioning Plaintiff about his wife's bruises, telling Plaintiff that Miller was investigating a domestic disturbance, that Patsey had invited the officers into the apartment, and that the officers were not leaving until they found out what happened to Patsey. (Miller Decl. at ¶ 3.)

As can be heard in Miller's audio recording of this interview, Plaintiff then told Miller, "Now, if I have to get up, I'm sure you're gonna drop me, but—bye!" (Ex. E to Miller Decl. at 1:47-1:53.) Muguira, who at the time was speaking with Patsey, heard this statement and interpreted it as a threat—that "if [Plaintiff] had to get up, he was going to fight." (Muguira Decl. at ¶ 4.) Though Plaintiff maintains this was not his intention in making the statement (Dkt. 47 at 7), it was not unreasonable for Muguira to interpret Plaintiff's ambiguous statement in the manner he did.

Throughout the early portion of Miller's interview, Plaintiff was speaking loudly, which progressed fairly quickly to shouting:

| | |
|---|---|
| Miller: | Jimmy, she's got injuries all over her face, what happened to her face? I just—if you could just tell me what's going on here, did anything happen between you guys? |
| Plaintiff: | Nope. Bye. |
| Miller: | Why would she call 911 then? |
| Plaintiff: | She didn't. |
| Miller: | Yes. |
| Plaintiff: | Not from my phone. |
| Miller: | She called from some phone. |
| Plaintiff: | Not from mine. Bye. |
| Miller: | We had, we had an open line. |
| Plaintiff: | Bye! Bye! Get outta my apartment! Now! |
| Miller: | Hey, relax. Relax. |
| Plaintiff: | Get outta my apartment! |

(Ex. E to Miller Decl. at 1:59-2:23.) The Court notes that, from the audio recordings, it sounds as if Plaintiff was inebriated. Plaintiff again told Miller to leave the apartment, at which point Officer Muguira came inside and informed Plaintiff he was under arrest.[6]

(Ex. B to Muguira Decl. at 2:38-2:40.)

---

[6] Plaintiff complains that Defendants' statement that Muguira told Plaintiff he was under arrest while Muguira was "escorting [him] to the police car" (SOMF at ¶ 8) is "completely fabricated" (Dkt. 47 at 9). There is no evidence to support Plaintiff's accusation. It is true that Muguira first informed Plaintiff

Plaintiff had had surgery on his right shoulder approximately six or seven weeks earlier and, while Muguira was placing him in handcuffs, alluded to this shoulder injury:

| | |
|---|---|
| Plaintiff: | Ah, I just got that shoulder repaired. |
| Muguira: | It's obviously strong enough to hit women. |
| Plaintiff: | I don't hit nobody. |
| Muguira: | Really? |
| Plaintiff: | Yeah. |
| Muguira: | Oh, boy. |

(Ex. E to Miller Decl. at 2:46-2:58; Ex. B to Muguira Decl. at 2:48-3:00.)

Although Plaintiff states that Muguira "wrench[ed]" Plaintiff's right arm behind his back while placing him in handcuffs and that Plaintiff felt his surgical shoulder repair "come undone" (Dkt. 47 at 2), Officers Miller and Muguira both state that Muguira did not pull on Plaintiff's arm and that Plaintiff did not indicate that the handcuffing hurt his shoulder. (Miller Decl. at ¶ 4; Muguira Decl. at ¶ 4). The officers' statements are corroborated by the audio recordings, in which no sounds of discomfort, pain or any other objection or disturbance can be heard at this point, other than Plaintiff's single reference to the fact that he had previously had his shoulder repaired. (Ex. E to Miller Decl. at 2:37-2:53; Ex. B to Muguira Decl. at 2:39-2:55.) Further, though Plaintiff claims that he told Muguira, "Please be careful with [my] shoulder" (Dkt. 47 at 2; Compl. at 11), that

---

he was under arrest inside the apartment, but it is also true that, on the walk to the police car, Plaintiff engaged Muguira in a discussion about the incident. Plaintiff claimed he did not do anything wrong and that Patsey would tell the police the same thing, and Muguira disagreed, saying, "You wouldn't be in handcuffs if she was telling us something different." (Ex. B to Muguira Decl. at 4:42-4:54.)

contention is blatantly contradicted by the audio recording, which does not include any such statement. *See Scott*, 550 U.S. at 380.

Nonetheless, the Court accepts, for purposes of this decision, that Muguira applied at least some quantity of pressure to Plaintiff's arm or shoulder in order to place Plaintiff in handcuffs, and that the pressure was painful and resulted in further injury to Plaintiff's shoulder. Muguira states that, in handcuffing Plaintiff, he used "only the amount of force necessary to effectuate the arrest." (Muguira Decl. at ¶ 8.)

Plaintiff can be heard quasi-singing, "Here we go again," after Muguira placed him in handcuffs and began to take him out of the apartment; Muguira told Plaintiff to "stop flexing," which Plaintiff denied he was doing, and Plaintiff and Muguira disagreed about this several times. (Ex. B to Muguira Decl. at 3:03-3:12 ("Yes, you are," "No, I'm not," etc.).) From the recording, a picture emerges that neither Plaintiff nor Muguira was particularly happy to be in the situation they were in.

However, a calm and relatively civil discussion followed while Muguira helped Plaintiff put on his shoes, coat, and hat prior to leaving the apartment, with Plaintiff saying "please" and "thank you" to Muguira. (*Id.* at 3:15-4:25.) Muguira escorted Plaintiff to the patrol car, while Miller remained behind to speak with Patsey. On the way to the car, Plaintiff maintained his innocence, stating that nothing happened in the apartment and that Patsey would confirm that. Muguira disagreed, telling Plaintiff that Pastey had a "giant black eye" and that she had said Plaintiff punched her three times in the face. (*Id.* at 4:40-5:06.)

Plaintiff began calling Muguira a "liar," then a "fucking liar," and then again said Patsey would say Plaintiff did not hit her. Muguira replied, "I highly doubt that." (*Id*. at 5:06-5:24.) During all of this, Plaintiff and Muguira can be heard walking to the patrol car. No sounds of a fight or any type of scuffle can be heard during the walk to the car. But Ryan Tone, who states he was a witness to the events, states that he saw an officer (who must have been Muguira) "jerk[] Plaintiff's arm, pulling him closer to him." (Tone Aff., Dkt. 70, at ¶ 11.) Notably, Tone does not state that this action was particularly forceful or that it appeared stronger than necessary to ensure Plaintiff remained in Muguira's control. (*Id*.)

Once at the patrol car, Muguira attempted to search Plaintiff incident to the arrest. Muguira directed Plaintiff to spread his feet, but Plaintiff refused. (Muguira Decl. at ¶ 5; Ex. B to Muguira Decl. at 5:33-5:34.) Plaintiff refused multiple times, while at the same time telling Muguira that he was not resisting. In attempting to search Plaintiff, Officer Muguira can be heard using the phrases "please" and "thank you" and addressing Plaintiff as "sir." (Ex. B to Muguira Decl. at 5:33-5:58.) Muguira remained polite throughout this exchange. Plaintiff's allegation that Muguira was attempting to "incit[e] [Plaintiff] into a confrontation," and "facilitate[e] a false and misleading confrontation" resulting in a misleading audio recording, is not based on Plaintiff's personal knowledge of Muguira's state of mind and, therefore, will not be accepted as fact. (*See* Dkt. 47 at 10.)

In addition to refusing to comply with Muguira's instructions to spread his feet, Plaintiff also physically resisted Muguira's attempts to spread Plaintiff's feet. (Muguira Decl. at ¶ 5.) Notably, witness Ryan Tone does not dispute Muguira's statement that Plaintiff physically resisted spreading his feet, though he does state that after Plaintiff refused several times, it "sounded like" Muguira was trying to kick Plaintiff's feet apart. (Tone Aff. at ¶ 12.) Though Plaintiff attempts to deny Muguira's allegation that he physically resisted these attempts and states that Plaintiff "automatically spread [his] legs" to be searched (Pl. Decl., Dkt. 47-1 at ¶ 10), the clear documentary evidence in the record—in the form of Muguira's audio recording where Plaintiff can be heard refusing many times to spread his feet—blatantly contradicts Plaintiff's statement.[7]

Further, Plaintiff's allegation that he was not confrontational while Muguira was attempting to search him (Dkt. 47 at 10; SOMF at ¶ 9) is plainly refuted by the audio recording. Plaintiff repeatedly yelled at Muguira and refused to comply with his instructions. Therefore, the Court need not accept Plaintiff's claim that he was not confrontational at this point.

According to Tone, Muguira opened the back door of the car and "was demanding [Plaintiff] get in the back of the car." (Tone Aff. at ¶ 13.) Tone then saw Plaintiff

---

[7]     Specifically, Plaintiff claims that his feet were already spread when Muguira instructed him to spread them, but that Plaintiff "told him no to be a smart ass to him, because I figured he was being one to me, by telling me to spread my already spred [sic] legs." (Pl. Decl. at ¶ 10.) To believe Plaintiff's assertion, a juror would have to conclude not only that Plaintiff's feet were already spread when Muguira instructed him to spread them, but also that both Plaintiff and Muguira went on to have several minutes of conversation—with Muguira telling Plaintiff to spread his feet and Plaintiff saying no over and over again—without either of them actually saying that Plaintiff's feet were already spread. Because "no reasonable jury could believe" such an assertion, the Court does not accept it. *See Scott*, 550 U.S. at 380.

"looking at [Muguira] shaking his head no and say[ing] 'no,'" after which Muguira struck Plaintiff in the face. (*Id.*) Plaintiff alleges that "after the 3 or 4 time of saying no Officer Muguira "punched [Plaintiff] in the mouth" and slapped him with an open hand, causing Plaintiff's head to strike the trunk of the car. (Pl. Decl. at ¶ 11.)

The only thing that can be clearly heard on the audio at this point is Plaintiff's calm statement, "That's battery," followed by Muguira saying, "That is not battery." (Ex. B to Muguira Decl. at 5:48-5:50.) None of the alleged punch or slaps or trunk-strikes can be clearly heard on the audio recording, and Defendant Muguira avers that the force he used against Plaintiff at this point was "necessary to ... search [Plaintiff] incident to arrest." (Muguira Decl. at ¶ 8.)

Plaintiff then began shouting:

| | |
|---|---|
| Plaintiff: | I'm not resisting, I'm not doing anything, my hands in cuffs, I ain't got no weapon on me, fucking hit me again! |
| Muguira: | I never hit— |
| Plaintiff: | Hit me again! |
| Muguira: | I never hit you. |
| Plaintiff: | Slam my face in that fucking trunk again! |
| Muguira: | I never slammed your face in the—in the trunk. |
| Plaintiff: | I didn't do nothing wrong. |
| Muguira: | Jimmy, spread your feet. |
| Plaintiff: | No! |

(Ex. B to Muguira Decl. at 6:00-6:17.)

Muguira again instructed Plaintiff to spread his feet as Plaintiff repeatedly shouted, "No!" (*Id.* at 6:17-6:28.) Muguira told Plaintiff he needed to be searched before Muguira placed him in the police car. When Plaintiff again said he was doing nothing wrong, Muguira informed Plaintiff that, "now, on top of the domestic, you're also going to be arrested for R and O" (likely, "resisting and obstructing," *see* Idaho Code § 18-705); Plaintiff kept saying, "No." (*Id.* at 6:32-6:36.) Plaintiff continued to refuse to comply with Muguira's instructions, and during part of Plaintiff's rant, Muguira can be heard chuckling—perhaps at the absurdity of Plaintiff's repeated claims that he was not resisting and not doing anything wrong while continuing to shout "No!" to Muguira and refusing to cooperate with Muguira's lawful directions. (*Id.* at 6:36-6:48.)

Muguira warned Plaintiff that Plaintiff was "just going to go in hobbles, how's that sound?" (*Id.* at 6:48-6:50.) This warning obviously was not effective because Plaintiff continued to refuse to cooperate, shouting,

| Plaintiff: | How about this? How about I did nothing wrong, ain't nobody called, and, you're slamming my face in the trunk! |
|---|---|
| Muguira: | Nobody slammed [unintelligible]— |
| Plaintiff: | Get your hands off of me! |
| Muguira: | Right now, sir— |
| Plaintiff: | How's that? |
| Muguira: | —due to your agitated state, I'm going to keep my hands on you. |
| Plaintiff: | Oh, yeah. |

|              |                |
|--------------|----------------|
| Muguira:     | Understand?    |
| Plaintiff:   | No!            |

(*Id*. at 6:58-7:14.) Muguira again told Plaintiff to spread his feet so he could be searched and placed in the police car, and Plaintiff again refused numerous times. (*Id*. at 7:14-7:20.) Plaintiff continued to call Muguira a liar and claim Plaintiff did nothing wrong. Muguira began to warn Plaintiff, saying, "If you turn around on me again," but Plaintiff interrupted, again claiming he was not resisting. (*Id*. at 7:21-7:51.)

The drama continued:

|              |                                                                                                      |
|--------------|------------------------------------------------------------------------------------------------------|
| Plaintiff:   | Get your hands off me!                                                                                |
| Muguira:     | I'm not going to get my hands off you, I need to pat-search you before you get in the back of my car. |
| Plaintiff:   | I ain't getting in your car.                                                                          |
| Muguira:     | You can continue making this difficult, or we can just get it over with.                              |
| Plaintiff:   | How about this?                                                                                       |
| Muguira:     | How about we—                                                                                         |
| Plaintiff:   | How about—                                                                                            |
| Muguira:     | —just get it over with?                                                                               |
| Plaintiff:   | —this?                                                                                                |

(*Id*. at 7:59-8:09.)

Plaintiff continued to proclaim his innocence, and even after Muguira told Plaintiff yet again to face the car, Plaintiff refused, yelling, "No! Fuck you! I ain't done nothing

wrong," and "Fuck that shoulder up again!" (*Id*. at 8:09-8:40.) Muguira again asked if Plaintiff would like to be hobbled, and he repeatedly warned Plaintiff that the night would "end poorly" for Plaintiff if he kept resisting arrest. (*Id*. at 8:40-9:02.)

The situation continued to escalate:

| | |
|---|---|
| Plaintiff: | Go ahead! Go ahead! |
| Muguira: | Go ahead what? |
| Plaintiff: | I ain't done nothing! I'm not—I'm not even resisting! |
| Muguira: | You are resisting, Jimmy. |
| Plaintiff: | No I'm not! |
| Muguira: | You absolutely are. |
| Plaintiff: | How can I resist? I got handcuffs, how can I— |
| Muguira: | Ugh. |
| Plaintiff: | —resist? |
| Muguira: | Jimmy— |
| Plaintiff: | Fuck you! |
| Muguira: | All you had to do was get in the back of the— |
| Plaintiff: | Fuck— |
| Muguira: | —car. |
| Plaintiff: | —you. |
| Muguira: | All you had to do was spread your feet so I could pat-search you, get in the back of the car and you'd be warm. |

| | |
|---|---|
| Plaintiff: | You ain't got no right! |
| Muguira: | We do have the right, you beat your wife! |
| Plaintiff: | No you don't! Really? |
| Muguira: | You beat your wife, Jimmy. |
| Plaintiff: | Really? |
| Muguira: | Yes! |
| Plaintiff: | Prove it. |
| Muguira: | I will prove it, in court! |
| Plaintiff: | Yeah, good luck. |

(*Id*. at 9:19-9:54.)

Eventually, Muguira was able to empty Plaintiff's pockets, all while Plaintiff continued to say "fuck you" to Muguira. (Muguira Decl. at ¶ 6; Ex. B. to Muguira Decl. at 9:59-10:12.) According to Tone, who was allegedly "in front of [Plaintiff's] SUV, beside a tree where no one could see" him,[8] Muguira placed several items from the search of Plaintiff onto the trunk of the car. (Tone Aff. at ¶¶ 12-13.)

Muguira then resumed trying to get Plaintiff into the police car. (Muguira Decl. at ¶ 6.) Plaintiff admits that he refused Muguira's instructions to get in the car, though Plaintiff claims his refusal was because he was afraid for his life. (Pl. Decl. at ¶ 11.) Plaintiff again physically resisted Muguira's attempts and refused to put his legs in the

---

[8]     Tone explains that he did not want to be seen by the police and "feared being arrested since [he] had a warrant for [his] arrest for absconding." (Tone Aff. at ¶ 11.)

**MEMORANDUM DECISION AND ORDER - 21**

vehicle. (Muguira Decl. at ¶ 6.) Plaintiff's contention that he was not "resisting in any shape or form or fashion" (Dkt. 47-1 at 5), is belied by his own recorded statements in refusing to be searched or to get in the car. Because Plaintiff would not get in the car himself, Muguira was required to force Plaintiff into the car.

Plaintiff states that after he "refus[ed] to walk to the back [of the car] to get in [the car] unescorted," Muguira struck Plaintiff "in the back of the head with his forearm, forcing [Plaintiff's] head to strike the trunk of the car again." (Pl. Decl. at ¶ 12.) Similarly, Tone describes this interaction as Muguira using his forearm to strike Plaintiff "in the back of the head," after which Plaintiff's head "struck the trunk of the car ... at least 2 or 3 times." (Tone Aff. at ¶ 14.)

Plaintiff describes what happened next as follows: "Muguira came up to me [and] interlocked his left arm in to my right arm, as he jerked me around really hard toward the back opened door, then instantly I was airbourne [sic], I came down hard my left knee struck a steel grate, again I was not resisting, I was not violent, or fighting or anything, I was truly scard [sic] for my life." (Pl. Decl. at ¶ 13.) According to Muguira, because Plaintiff "would not put his legs in the vehicle," Muguira "was forced by [Plaintiff's] resistance, to remove him from the vehicle and place him face down on the ground." (Muguira Decl. at ¶ 6.) It appears that Plaintiff was almost in the car (standing in the opening of the rear door) and was then taken to the ground at least a short distance away. It is undisputed that, within a very short period of time, Muguira had Plaintiff face-down on the ground.

For purposes of summary judgment, the Court must accept Plaintiff's and Tone's contentions (1) that Muguira hit Plaintiff in the face and caused Plaintiff's head to strike the trunk of the car after Plaintiff refused to be searched or to get into the car, (2) that Muguira—by using his forearm in attempting to get Plaintiff into the car after Plaintiff refused to get in voluntarily—then caused Plaintiff's head to strike the trunk of the car at least once more, and (3) that Muguira threw Plaintiff to the ground after Plaintiff refused to get into the car. However, none of these impacts were hard enough to be heard clearly on the audio recording, though some sort of fracas is audible. (Ex. B to Muguira Decl. at 10:20-11:05.) Further, Plaintiff does not allege that he sustained any injuries to his face or head from the impacts to the car trunk or from being struck. (*See generally* Pl. Decl., Dkt. 47-1 (complaining only of shoulder and knee injuries).) Throughout this scuffle, Plaintiff continued to scream profanities at Muguira and yell that he was not resisting. (Ex. B to Muguira Decl. at 11:05-12:10.) According to Muguira, he used only the amount of force necessary to get Plaintiff under control so that he could be placed in the patrol car following the arrest and the search incident to that arrest. (Muguira Decl. at ¶ 8.)

Muguira then placed Plaintiff in maximum leg restrains, or hobbles, as Muguira had previously warned would happen if Plaintiff continued to refuse to cooperate. (*Id.* at ¶ 7; Pl. Decl. at ¶¶ 14-15.) Plaintiff describes being hobbled as being "hogtied," and Defendants do not dispute this characterization. (*Id.* at ¶ 18.)

At this point, Defendant Community Service Officer Jessica Bovard arrived at the scene to take photographs of Patsey's injuries, and Muguira declined Bovard's offer to

help get Plaintiff into the car. (*Id*. at ¶ 16; Muguira Decl. at ¶ 6.) Though Defendants contend that Bovard "arrived at the scene as Officer Muguira was escorting [Plaintiff] handcuffed ... to a BPD patrol vehicle" before the incident at the car (SOMF at ¶ 8), the Court accepts Plaintiff's allegation that Bovard came upon Plaintiff only after he was already on the ground and that Bovard went into the apartment after Plaintiff was hobbled, leaving Plaintiff with Muguira outside. (Pl. Decl. at ¶¶ 15-18.) By that time, Muguira "was atop of [Plaintiff] with his knee in the small of [Plaintiff's] back." (*Id*. at ¶ 14.)

Tone, who was still hiding from the police with Plaintiff's SUV between himself and the scene, states that, while Plaintiff was being hobbled, the officer struck Plaintiff again a few more times and may have "tr[ied] [to] shove [Plaintiff's] face into the pavement"—at least, that is "what [it] looked [like] to" Tone. (Tone Aff. at ¶ 15.) Plaintiff does not allege that he suffered any injury as a result of Muguira's attempt to shove Plaintiff's face into the pavement or any of the hits Muguira allegedly landed while hobbling Plaintiff. (Pl. Decl. at ¶¶ 18-19, 23, 26, 38-39.)

Officer Miller came out of the apartment after finishing his interview with Patsey and saw that Muguira had Plaintiff on the ground. (Muguira Decl. at ¶ 6; Miller Decl. at ¶ 7.) Muguira and Miller then tried to get Plaintiff into the car, instructing him to bend his legs to help them, which Plaintiff—keeping to his theme of the night—refused to do. (Miller Decl. at ¶ 7; Ex. C to Muguira Decl. at 0:01-0:24.) Plaintiff's contention that he "was complying to the best of his ability" (*see* Dkt. 47 at 14) is blatantly contradicted by

the audio recording. Plaintiff continued to shout profanities, accuse the officers of lying, and demand that they let him go because he did nothing wrong and Patsey would tell them "the same fucking thing." (Ex. C to Muguira Decl. at 0:25-2:32.)

The officers' voices throughout this period of time sound strained, suggesting that they were lifting Plaintiff or otherwise "toss[ing]" Plaintiff into the back seat of the car after Plaintiff's repeated refusals to comply. (Tone Aff. at ¶ 17.) Plaintiff was told to "watch [his] head," and the car door can be heard being closed.[9] (Ex. C to Muguira Aff. at 2:33 to 3:00.) Therefore, it can be reasonably assumed that, at this point, Plaintiff was in the back of the patrol car—for the time being. One of the officers told Plaintiff to "shut the fuck up" and called him a "motherfucker." (Ex. E to Miller Decl. at 16:48-16:53.)

Defendants contend Plaintiff then "managed to kick out of the hobbles necessitating that he be removed from the car and re-hobbled before transporting" to the jail. (SOMF at ¶ 15.) Though Plaintiff states that he "did not try or succeed[] in escaping from the use of hobbles," he does not dispute that the officers reasonably believed that the hobbles needed to be redone or tightened. (Pl. Decl. at ¶ 20.) Plaintiff and the officers disagreed over whether the hobbles were "double-locked," and one officer asked Plaintiff if the hobbles needed to be tighter, or if Plaintiff would be cooperating until they got him to the jail. (Ex. C to Muguira Decl. at 3:20-3:36.)

---

[9]     Plaintiff's allegation that the officers slammed the car door into Plaintiff's head several times is blatantly contradicted by the audio recording, in which no such sounds can be heard. *See Scott*, 550 U.S. at 380.

Plaintiff was also asked if he would be okay as he was, or if he needed to be re-hobbled. Plaintiff responded, "Fuck you." (*Id*. at 3:42-3:50.) An audible scuffle followed, most likely while the officers were getting him out of the car to re-hobble him or while they were re-hobbling him. (*Id*. at 3:50-4:00.) Whether the officers merely tightened the hobbles at this point or removed the hobbles entirely before re-hobbling Plaintiff is immaterial.

Plaintiff states that, in the course of re-hobbling him or tightening the hobbles, Miller and Muguira pulled him out of the car twice, "dropped" him on the ground, and tightened the hobbles until Plaintiff "was in to a U shape" and could not move. (Pl. Decl. at ¶ 18.) Ryan Tone's affidavit is similar: "As both cops were standing and talking the native looking cop was pointing and looking towards the back of the car. They then opened the back door[,] pulled [Plaintiff] out dropping him to the ground, this was done twice each time they tightened his legs and arms tighter[;] the last time [Plaintiff] looked like he was in a 'U' shape." (Tone Aff. at ¶ 18.) Tone also claims that he "did not see any reason" why the officers tightened the hobbles. (*Id*.) However, Tone also does not allege that he saw any of Plaintiff's actions inside the police car, which the officers undisputedly *did* see, before the officers took Plaintiff out of the car to tighten the hobbles.

The officers then had to get Plaintiff back into the car. At this point, Plaintiff can be heard moaning and making sounds of apparent pain. (Ex. C to Muguira Decl. at 4:00-4:27.) One of the officers stated, "All right, Jimmy, we gotta do this again, okay?" and

warned Plaintiff that the more he struggled against the hobbles, the more they would hurt. (*Id*. at 4:28-4:35.) As the officers tried to put Plaintiff back into the car, Plaintiff began calling out, "My arm, my arm, my arm!" (*Id*. at 4:55-4:58.) Plaintiff states that his "left and right shoulders were being ripped out [of the] socket as [Plaintiff] felt tendons and ligaments tearing." (Pl. Decl. at ¶ 19.)

At the same time, the officers were speaking to each other and working out how best to maneuver Plaintiff back into the car. (Ex. C to Muguira Decl. at 4:59-5:10.) Once Plaintiff was in the car, Miller went back into the apartment complex to try to locate one of Plaintiff's neighbors, who, according to Patsey, may have been a witness. (Ex. E & G to Miller Decl.)

Back in the police car, Plaintiff let out a scream and then went silent. Muguira tried to get Plaintiff's attention and said he was going to "look back at you, make sure you're still breathing." (Ex. C to Muguira Decl. at 5:13-5:34.) After calling Plaintiff's name several times, Muguira said, "Well, you're trying to pull away from me so you're obviously alive." (*Id*. at 5:45-6:02.) Muguira continued trying to rouse Plaintiff. However, Plaintiff remained silent for the remainder of Muguira's audio recording, evidently "pass[ed] out drunk." (*Id*. at 6:04-6:05, 6:06-20:48.)

The parties dispute the extent to which Plaintiff was injured during his arrest, and the Court thus accepts Plaintiffs' assertions (1) that the incident resulted in a knee injury, in a serious re-injury to his right shoulder, and in a new injury to his left shoulder, and (2) that Plaintiff suffered or continues to suffer pain from those injuries. (Pl. Decl. at ¶¶ 19,

23, 26, 38-39; *see also* Exhibits to Dkt. 70 (Plaintiff's medical records).) As noted previously, Plaintiff does not contend that he suffered injury to his face or head the night of his arrest. (*Id*.)

For his actions on November 29, 2014, Plaintiff was convicted of felony domestic battery and misdemeanor resisting arrest. (Ex. H to Muir Decl., Dkt. 40-6, at 3-7.)

**2.     Standard of Law Governing Summary Judgment**

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment ...." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Rather, there must be no *genuine* dispute as to any *material* fact in order for a case to survive summary judgment. Material facts are those "that might affect the outcome of the suit." *Id.* at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party is entitled to summary judgment if that party shows that each material fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record or may show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotation marks omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific, triable facts." *So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which [a] jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Material used to support or dispute a fact should be "presented in a form that would be admissible in evidence," or it may be subject to being stricken. Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in

evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The Court may grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. Although all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

Statements in a brief, unsupported by the record, cannot be used to create an issue of fact. *Barnes v. Indep. Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995). The Ninth Circuit "ha[s] repeatedly held that documents which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment." *Beyene v. Coleman Sec. Services, Inc.,* 854 F.2d 1179, 1182 (9th Cir. 1988) (citation and internal quotation marks omitted). Authentication, required by Federal Rule of Evidence 901(a), is not satisfied simply by attaching a document to an affidavit. *Id.* The affidavit

must contain "testimony of a witness with personal knowledge of the facts who attests to the identity and due execution of the document." *Id.*

Pro se inmates are exempted "from *strict* compliance with the summary judgment rules," but not "from *all* compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018) (citing *Blaisdell v. Frappiea*, 729 F.3d 1237, 1241 (9th Cir. 2013). *See id.* ("[W]e do not entirely release [the pro se prisoner plaintiff] from any obligation to identify or submit some competent evidence [in opposing a summary judgment motion]."). In opposing a motion for summary judgment, a pro se inmate must still submit evidence, such as a "declaration, affidavit, authenticated document, or other competent evidence," to support his or her allegations or to dispute the moving party's allegations. *Id.* (upholding grant of summary judgment against pro se inmate because the "only statements supporting [plaintiff's] . . . argument are in his unsworn district court responses to the defendants' motion for summary judgment and to the district court's show-cause order.").

### 3.      Standard of Law Governing Excessive Force Claims

When an arrestee "alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014).[10] That amendment requires that officers

---

[10]      Plaintiff states that various actions taken by the officers on the night Plaintiff was arrested were taken in violation of Boise Police Department policy. However, whether an action violated police policy is not relevant for purposes of § 1983, because violations of state laws or policies are not cognizable in a civil rights action. *See Walker v. Sumner*, 14 F.3d 1415, 1420 (9th Cir. 1994) (as long as minimum constitutional requirements are met, a governmental entity need not comply with its "own, more generous procedures"), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995); *Huron Valley Hosp. v. City of Pontiac*, 887 F.2d 710, 714 (6th Cir. 1989) ("[Section 1983] is thus limited to

use only an amount of force that is "objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotation marks omitted). Importantly, police officers are *not* required to use the least amount of force necessary to arrest a suspect. *Luchtel v. Hagemann*, 623 F.3d 975, 982 (9th Cir. 2010).

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment," and whether an officer's use of force was objectively reasonable is based on the totality of the circumstances. *Graham*, 490 U.S. at 396 (internal quotation marks and citation omitted). The objective reasonableness inquiry requires "balancing the nature and quality of the intrusion on a person's liberty with the countervailing governmental interests at stake," *Davis*, 478 F.3d at 1053-54 (internal quotation marks omitted).

When analyzing excessive force claims, courts consider several factors in this balancing test. First, the "quantum of force" used by the police must be assessed. *Id*. at 1054. Second, the governmental interests at stake must be analyzed in light of the following factors: (1) the severity of the crime for which the plaintiff was arrested; (2) whether the plaintiff posed a threat to the safety of the officers or others; (3) whether the plaintiff was actively resisting arrest or attempting to flee; and (4) the availability of alternative methods of subduing the plaintiff. *Id.*; *see also Graham*, 490 U.S. at 396. With

---

deprivations of *federal* statutory and constitutional rights. It does not cover official conduct that allegedly violates *state* law.") (relying on *Baker v. McCollan*, 443 U.S. 137, 146 (1979)). Thus, the Court will consider only whether the officers' actions violated the Fourth Amendment.

respect to the alternative-methods factor, whether the arrestee was given a warning prior to the arrest or the use of force is an important consideration. *See Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1165 (9th Cir. 2011) ("[The officer] could have warned Young that he would be placed under arrest if he did not comply with the order; he could have warned Young that disobedience would lead [the officer] to use force against him; he could have simply begun to effect Young's arrest by attempting to handcuff him; or he could have called for assistance ....").

Of these governmental interest factors, whether the suspect posed a threat is the "most important single element." *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (internal quotation marks omitted). If an arrestee has "not in any way threatened [an officer or others] or indicated any propensity for violent behavior," it is likely that the use of substantial force will be objectively unreasonable. *Young*, 655 F.3d at 1166.

If—after balancing "the gravity of the intrusion on the individual against the government's need for that intrusion," *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010)—the reviewing court determines that the force applied was objectively reasonable, summary judgment in favor of the officers is appropriate. Contrarily, if the evidence, when viewed in the light most favorable to the plaintiff, could reasonably support a finding that the force used was objectively unreasonable, then the officers are not entitled to summary judgment. *Smith*, 394 F.3d at 701.

The Supreme Court has emphasized that courts must not rely on their own hindsight in determining whether an officer's use of force was reasonable. Rather, the

"calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

**4.    Discussion**

Plaintiff's claims of excessive force can be separated into five sub-claims. First, Plaintiff contends that (a) Officer Muguira used excessive force when he allegedly wrenched Plaintiff's right arm behind him in order to handcuff him while in Plaintiff's apartment, and (b) Officer Miller should have acted to prevent Muguira from wrenching Plaintiff's arm at that time.

Second, Plaintiff asserts that Muguira used excessive force when, following Plaintiff's refusal to allow Muguira to conduct a search incident to the arrest and refusal to get into the police car, Muguira allegedly (a) hit Plaintiff in the face, (b) used his forearm and caused Plaintiff's head to strike the trunk of the police car more than once, and (c) threw Plaintiff to the ground.

Third, Plaintiff appears to contend that Muguira used excessive force in hobbling Plaintiff, once he was on the ground, when Muguira hit Plaintiff several more times and attempted to shove his face into the pavement.

Fourth, Plaintiff claims that Bovard's failure to intervene once Plaintiff was "already in custody, handcuffed, in hobbles and on the ground" violated the Fourth Amendment. (Pl. Decl. at ¶ 15.)

Fifth, Plaintiff claims that, once Miller joined Muguira outside the apartment and after Plaintiff was hobbled, Muguira and Miller used excessive force in initially placing Plaintiff in the car, in taking him out of the car and re-hobbling him (or tightening the hobbles), and in putting him into the police car once again.

### A. Muguira and Miller Are Entitled to Summary Judgment on Plaintiff's Claims That They Used Excessive Force When Muguira Wrenched Plaintiff's Arm Behind Him While Handcuffing Plaintiff

In considering whether Muguira's use of force in handcuffing Plaintiff, and whether Miller's passive acceptance of that use of force, was reasonable, the Court first considers the amount of force used. *See Davis*, 478 F.3d at 1054. Although Plaintiff describes the force as "wrenching" and the force used was enough to cause pain to Plaintiff, it is clear from the audio recording that the pain was not particularly severe. At the time he was handcuffed, Plaintiff stated calmly that he had just had his shoulder repaired. (Ex. E to Miller Decl. at 2:37-2:53; Ex. B to Muguira Decl. at 2:39-2:55.) Plaintiff gave no indication at the time that the force used by Muguira was especially great or heavy-handed. The fact that Plaintiff felt his shoulder surgery "come undone" (Dkt. 47 at 2) does not necessarily mean that Muguira used a great amount of force. Given that Plaintiff had a pre-existing injury and had had shoulder surgery only six or seven weeks before his arrest, his shoulder could have been seriously re-injured by the handcuffing even without severe force being applied. The force that Muguira used to place Plaintiff in handcuffs, although strong enough to cause pain, was not substantial.

Next, the Court must consider the governmental interests at stake. The first factor in this inquiry is the severity of the crime for which Plaintiff was arrested. *See Davis*, 478

F.3d at 1054. Domestic violence is "serious[]" and "reprehensible[]," *Smith*, 394 F.3d at 703, and Plaintiff's act of domestic battery in this case was particularly violent. Plaintiff seriously injured Patsey, punching her in the face to the point that she blacked out; when the officers first arrived at the apartment, Patsey had a black eye, a bloody nose, and a bloody mouth. (Miller Decl. at ¶ 2; Muguira Decl. at ¶ 3; SOMF ¶ 4; Ex. B. to Muguira Decl. at 1:58-2:09.)

The second factor is whether Plaintiff posed a danger to the officers or others. *See Davis*, 478 F.3d at 1054. The undisputed facts show that Plaintiff posed a threat to Patsey, as he had just severely beaten her, and that Plaintiff posed at least some danger to the officers. Plaintiff appeared to be drunk, acted confrontational during his interview with Officer Miller, and made a statement that Officer Muguira reasonably interpreted as a threat that if Plaintiff got out of his chair, there would be a fight. (SOMF at ¶ 3; Ex. B to Muguira Decl. at 1:24-1:26; Ex. E to Miller Decl. at 1:47-1:53.)

As for the resistance factor, at the point Plaintiff was placed in handcuffs, he was not actively resisting arrest or attempting to flee, though he had recently been confrontational with Miller. The fourth factor, alternative methods of subduing the suspect, is not particularly important in this instance. Muguira unquestionably had to handcuff Plaintiff. Even though he perhaps could have used a smaller amount of force in handcuffing Plaintiff behind his back, Muguira was not required to do so. *See Luchtel*, 623 F.3d at 982 ("Police officers need not use the least intrusive means available to them.").

Weighing "the gravity of the intrusion on [Plaintiff] against the government's need for that intrusion," *Espinosa*, 598 F.3d at 537, the Court concludes, as a matter of law, that the force Muguira applied in handcuffing Plaintiff was objectively reasonable under the Fourth Amendment. The force used was not particularly significant or substantial, Plaintiff appeared to pose at least some danger to the officers and to Patsey, and his crime was violent and severe. Even though the force applied to Plaintiff's arm was painful and may have seriously reinjured his shoulder, that force was not unconstitutionally excessive. Therefore, Defendants Muguira and Miller are entitled to summary judgment on Plaintiff's handcuffing claims.

### B.    *Muguira Is Entitled to Summary Judgment on Plaintiff's Claim That Muguira Used Excessive Force Following Plaintiff's Refusal to Comply with Muguira's Instructions to Spread His Feet or Get into the Car, and before Plaintiff was Initially Hobbled*

Plaintiff's next excessive force claim involves Muguira's alleged actions in hitting Plaintiff, striking the back of Plaintiff's head so that it struck the trunk of the car at least twice, and bringing Plaintiff face-down to the ground.

The amount of force used by Muguira throughout this period of time constituted intermediate force: "less severe than deadly force, [but] nonetheless present[ing] a significant intrusion upon an individual's liberty interests." *Young*, 655 F.3d at 1161. That is, though Muguira's use of force was not insubstantial, it did not even approach near-deadly force.

With respect to the hit to Plaintiff's face and one of the head-strikes, Plaintiff objected to this use of force at the time with only the calm and (relatively) quiet

statement, "That's battery." (Ex. B to Muguira Decl. at 5:48-5:50.) Further, the impacts from Muguira's alleged actions—including the head-strikes to the trunk of the car—were not hard enough to be heard on the audio recording or to cause facial or cranial bruising, bleeding, or any other injury to those areas. Therefore, Muguira's actions to this point cannot have been especially forceful. Even adding the fact that Muguira threw Plaintiff to the ground, the force used by Muguira from the time of arriving at the police car to Plaintiff's being taken to the ground was not particularly rough. Thus, though the Court accepts, for purposes of this decision, Plaintiff's contention that Muguira's actions caused him serious pain, the Court need not, and does not, conclude that the hits, head-strikes, and taking Plaintiff to the ground were egregious uses of force.

The government's interests at stake at this point in the arrest were significant. The undisputed facts establish that the hit to Plaintiff's face and one of the trunk-strikes occurred not only after Plaintiff—who had recently committed a serious crime by severely beating his wife and who appeared drunk and irrational—acted in a confrontational manner toward Officer Miller during his interview, but also after Plaintiff (1) repeatedly yelled and shouted profanities at Muguira, (2) refused, many times, to spread his feet so that Muguira could conduct a search incident to the arrest, and (2) physically resisted Muguira's attempts to spread Plaintiff's feet. (Ex. E to Miller Decl. at 1:59-2:23; Muguira Decl. at ¶ 5; Ex. B to Muguira Decl. at 5:06-5:58.) The other trunk-strikes and Muguira's taking Plaintiff down to the ground came only after Plaintiff's additional refusal to get into the police car. Plaintiff argues that Muguira should have

"escort[ed] him and plac[ed] him inside the patrol car" instead of throwing him to the ground. (Dkt. 47 at 15.) However, Plaintiff's own statements from the audio recording establish that Plaintiff refused to allow Muguira to merely escort him.

Plaintiff was actively resisting arrest during these applications of force. *See Davis*, 478 F.3d at 1054. Further, Muguira did not take Plaintiff to the ground until after nearly five straight minutes of that resistance. (Ex. B to Muguira Decl. at 5:33-10:12.) Therefore, this case is not like *Young*, where the suspect had not been arrested and the suspect's "disobedience of a police officer [took] the form of passive noncompliance that create[d] a minimal disturbance and indicate[d] no threat, immediate or otherwise, to the officer or others." 655 F.3d at 1165.

Ryan Tone's assertion that he never saw Plaintiff "resist, struggle[,] or[] fight back with [Boise Police Department] that night" does not alter the Court's analysis on this issue. (*See* Tone Aff. at ¶ 19.) Tone acknowledges that he placed himself in front of an SUV where nobody could see him (*id.* at ¶ 11), thereby also assuring he could not see the entire scene for the entire length of time. Just because Tone did not see Plaintiff resisting arrest does not mean that Plaintiff did not, in fact, resist. Further, any allegation that Plaintiff never resisted is blatantly contradicted by the audio recording, *see Scott*, 550 U.S. at 380, and also must be disregarded because Plaintiff was convicted of resisting arrest, *see Rodriguez*, 29 P.3d at 404.

The risk-of-danger factor also weighs in favor of Muguira. *See Davis*, 478 F.3d at 1054. Although Plaintiff was no longer a danger to Patsey following his removal from the

apartment, he still posed a threat to Officer Muguira. Plaintiff was drunk and

confrontational—a risky combination for a police officer dealing with a person who had

just committed a serious crime of domestic violence. It is common knowledge both that

domestic violence situations are extremely tense, and that alcohol and belligerence do not

mix well; thus, Plaintiff posed a danger to Officer Muguira.

The alternative-methods factor weighs slightly in favor of Plaintiff, however. In

hindsight, perhaps Muguira could have refrained from hitting Plaintiff in the face, or

from using his forearm to cause Plaintiff's head to strike the car, and simply taken

Plaintiff down to the ground without those additional uses of force. But the "peace of a

judge's chambers" is far different from the strained and escalating circumstances that

Muguira faced on the night of Plaintiff's arrest. *Graham*, 490 U.S. at 396. And Muguira

*did* attempt several alternative methods to get Plaintiff to comply before resorting to

force—Muguira warned Plaintiff several times that (1) the night would end poorly for

Plaintiff and that he would be placed in hobbles, which required getting Plaintiff on the

ground, if Plaintiff continued to resist and (2) Plaintiff would be charged with resisting

arrest. Muguira also attempted to kick Plaintiff's legs apart and attempted to physically

place Plaintiff in the car before he hit Plaintiff, used his forearm, or threw Plaintiff to the

ground.

Moreover, the mere fact that Muguira could have used less intrusive means to

subdue Plaintiff does not render his use of force excessive. *See Luchtel*, 623 F.3d at 982.

Indeed, that Plaintiff's head struck the trunk of the car at least twice does not necessarily

mean that Muguira intentionally "slammed" Plaintiff's head against the car, as Plaintiff contends. (Pl. Decl. at ¶ 10.) The word "slammed" connotes a strong force, whereas Plaintiff's head striking the trunk of the car was not hard enough either to be heard on the audio recording or to cause injury to Plaintiff's face or head. Finally, although Plaintiff alleges—without any personal knowledge—that Muguira purposefully manufactured a confrontation so that he could use excessive force against Plaintiff in "revenge" for hurting Patsey (*id.*), Muguira's subjective intent in using force against Plaintiff is irrelevant. *See Graham*, 490 U.S. at 397 (holding that the reasonableness inquiry does not include consideration of officers' "underlying intent or motivation").

The force used was intermediate and the governmental interests were significant. Having balanced the governmental interests at stake against the amount of force Muguira used between the time he and Plaintiff arrived at the police car and the time he took Plaintiff to the ground, the Court concludes, as a matter of law, that Muguira's use of force was reasonable given the totality of the circumstances. One need only listen to Muguira's audio recording to understand that he acted reasonably when faced with Plaintiff's unrelenting hostility and active resistance. Muguira indisputably needed to search Plaintiff, who had just committed a violent crime and who posed a risk to Muguira, and to get him into the police car. Muguira cannot be blamed for physically forcing Plaintiff to spread his feet and for taking him down so he could hobble him and place him the car when Plaintiff absolutely refused to do so himself.

Officer Muguira was faced with a confrontational, drunk, and violent suspect and had to make a "split-second judgment[]" in a "tense, uncertain, and rapidly evolving" situation. *Graham*, 490 U.S. at 396-97. Considering all of the circumstances in the light most favorable to Plaintiff, Muguira's use of intermediate force in hitting Plaintiff, causing his head to strike the trunk of the car at least twice, and taking Plaintiff face-down to the ground was objectively reasonable, and Muguira will be granted summary judgment on this claim.

### C. Muguira Is Entitled to Summary Judgment on Plaintiff's Claim that Muguira Used Excessive Force in Hobbling Plaintiff while Hitting Him Several Times and Trying to Shove His Face into the Pavement

After Muguira took Plaintiff to the ground, he then placed Plaintiff in hobbles for transportation to the jail. Plaintiff alleges that in hobbling him, Muguira used excessive force.

Again, the Court first considers the amount of force. Ryan Tone states that, once Plaintiff was on the ground, he saw Muguira hit Plaintiff several more times and try to shove Plaintiff's face into the pavement. (Tone Aff. at ¶ 15.) Given that Plaintiff did not sustain any injuries from Muguira's alleged actions at this point, there is no genuine dispute that whatever force used by Muguira to strike Plaintiff was minimal. Tone also does not allege that what appeared to be Muguira's attempt to shove Plaintiff's face into the pavement was purposeful or successful, merely that it "looked to [Tone]" that that was what Muguira was trying to do. (*Id.*) Thus, this amount of force was also minimal.

The governmental interests remained substantial at this point of the incident. Given that Plaintiff was already on the ground, it is unlikely that he posed a significant

risk of danger, rather than a moderate risk, to Muguira. However, before Plaintiff was in the hobbles, he was still mobile and—with his previous resistance fresh in Muguira's mind—could have seriously injured Muguira before he was restrained in the hobbles.

With respect to the resistance factor of the analysis, it is not entirely clear whether Plaintiff was actively resisting the hobbles at this point. It is undisputed that the force used in this instance occurred while Plaintiff was being hobbled, not once the hobbling was completed and Plaintiff was hogtied, as can be gleaned from the Tone affidavit. (*Id.* ("As [Plaintiff] was on the ground, the cop putting the leg restraints on [Plaintiff], ... the cop ... struck [him] again ...." (emphasis added).). Setting aside the fact that Tone likely could not see Muguira's interactions with Plaintiff all that clearly, as Tone intentionally placed a large vehicle between himself and Officer Muguira so that Tone would not be seen, Tone's observations still do not establish that Plaintiff acquiesced in, rather than resisted, the hobbles.

Tone does not state that Plaintiff was compliant or that Plaintiff was not moving while Muguira was trying to hobble him. Indeed, given Plaintiff's previous non-compliance and resistance, it would be surprising if Plaintiff suddenly decided, at this point, to meekly submit to Muguira's attempt to hobble him. Therefore, although the Court cannot conclude that Plaintiff was actively resisting while he was being hobbled, the Court also cannot conclude that Plaintiff was submissive or compliant. *See Liiv v. City of Coeur D'Alene*, 130 Fed. Appx. 848, 851 (D. Idaho April 20, 2005) (unpublished) ("Plaintiff concedes that, although not actively resisting arrest, he was engaged in passive

resistance as he refused to cooperate with the officers' orders. For example, Plaintiff admits that he did not stand up on his own when asked to do so.") (internal quotation marks and ellipsis omitted).

As for the final governmental-interest factor—the availability of alternative means—by the time Muguira had taken Plaintiff to the ground, there were no longer other alternatives methods that could have gotten Plaintiff into the police car to be driven to jail. Muguira warned Plaintiff that he would be hobbled during transport to the jail if he continued to resist, but the warnings were ineffective. Plaintiff had demonstrated his unwillingness to comply with the Muguira's instructions to get into the car under his own power. Indeed, as the undisputed facts establish, Plaintiff did essentially everything he could do, while handcuffed, to avoid getting into that car. Muguira had just spent five minutes trying to get Plaintiff to comply without using the hobbles and, therefore, reasonably concluded that placing Plaintiff in the hobbles was necessary to get him to jail. (*See* Muguira Decl. at ¶ 8.) Neither Plaintiff's nor Tone's allegations give rise to a genuine dispute over Muguira's statement that he used only the amount of force necessary to place Plaintiff in the hobbles.

Given that the force used was minimal and that the governmental interests remained substantial, the Court concludes, as a matter of law, that the force used by Muguira in order to hobble Plaintiff was objectively reasonable.

### D. Bovard Is Entitled to Summary Judgment on Plaintiff's Claim That She Permitted the Use of Excessive Force by Failing to Intervene When She Saw Plaintiff Hobbled on the Ground

Plaintiff also claims that Defendant Bovard should have intervened to stop Muguira's use of force when she saw Plaintiff hobbled on the ground. There is no evidence in the record that, in the short time Bovard was near Plaintiff, she had any reason to believe that Muguira's use of force was objectively unreasonable. Plaintiff acknowledges that Bovard did not see Plaintiff until he was already on the ground and hobbled. He also acknowledges that she did not participate in the later actions, taken by Muguira and Miller, in re-hobbling Plaintiff or tightening the existing hobbles and in placing him in the patrol car. Instead, she went into the apartment to take photographs. Therefore, she did not use or approve of any amount of force, much less excessive force, and Defendant Bovard is entitled to summary judgment.

### E. Muguira and Miller Are Entitled to Summary Judgment on Plaintiff's Claims That They Used Excessive Force When Re-Hobbling Plaintiff (or Tightening the Hobbles) and When Physically Placing Him into the Police Car

Finally, Plaintiff challenges Muguira's and Miller's use of force in re-hobbling him or in tightening the hobbles, as well as the two officers' use of force in physically placing or tossing him into the police car. As with the previous applications of force, and for the same reasons, this use of force was objectively reasonable in light of the totality of the circumstances facing the officers.

It is undisputed that when Plaintiff was re-hobbled, or the hobbles were tightened, the hobbles became quite tight. However, those hobbles, although tight enough to cause

pain, did not cause any injury. Even if Plaintiff was "tossed" into the car, there is no evidence that the force was violent. Thus, the force applied was intermediate rather than severe. And the officers' interests in subduing Plaintiff and getting him off of the public street remained considerable. Miller and Muguira had a drunk, violent, and aggressive suspect on their hands, a suspect who had shown—time and time again—that he would not submit to the officers' authority and who had actively resisted arrest. Given that Plaintiff was essentially hogtied at this point and was clearly not submitting to the officers' authority, the officers had little choice other than to physically force Plaintiff into the car, and there were few, if any, alternatives available to the officers.

Under these circumstances, Muguira's and Miller's actions in re-hobbling Plaintiff and in getting him into the police car did not violate the Fourth Amendment.

## CONCLUSION

For the reasons set forth above, there is no genuine dispute as to any material fact, and Defendants' uses of force against Plaintiff on the night of his arrest were objectively reasonable under the Fourth Amendment. Therefore, Defendants are entitled to judgment as a matter of law.

## ORDER

**IT IS ORDERED:**

1.      Plaintiff's Motion to Extend Response Deadline to Court Order (Dkt. 69) is GRANTED.

2.  Plaintiff's Objection and Notice of Compliance (Dkt. 70), construed as a motion for reconsideration, is DENIED.

3.  Defendants' Motion for Summary Judgment (Dkt. 40) is GRANTED, and this entire action is DISMISSED with prejudice.

DATED: March 26, 2018

B. Lynn Winmill
Chief U.S. District Court Judge